IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Maureen McCarran

(Write the full name of each PLAINTIFF who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)

-against-

Metropolitan Transit Authority Police Department (MTAPD)

MTAPD Officer Thomas Shield 2521

MTAPD Officer Cortorreal Shield 2725

MTAPD Officer Yu Shield 3035

Yanique Johnson, EMT Basic (DOC)

Jeffrey Agnant, EMT Basic (DS) (DH)

(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)

Chen, J
Bloom, MJ

Complaint for Violation of Civil Rights (Non-Prisoner Complaint)

Case No. 24-cv-7329-PKC-LB

(to be filled in by the Clerk's Office)

Jury Trial: ☒

**Yes** ☐ No (check one)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. PLAINTIFF need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint. In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

## I. The Parties to This Complaint

**Note 1.** PLAINTIFF attempted to obtain the first names of Defendant Officers Cortorreal Shield 2725 (CORTORREAL) and Yu Shield 3035 (YU) from the Defendant MTAPD. The MTAPD declined to give them, stating that "the shorter one's name is Murray", when Murray was not listed in the "person summary" and was the officer who took the incident report EXHIBIT C from Samuel Thomas Shield 2521 (THOMAS). The first names of CORTORREAL and YU were not on the Incident Report, which PLAINTIFF received from FOIL. However, their Shield numbers were visible. There is no "officer lookup" for MTAPD personnel, like the NYPD has. It is hoped that the court will find identification by surnames and shield numbers sufficient or will grant more time to obtain them.

**A. The Plaintiff** Provide the information below for each PLAINTIFF named in the complaint. Attach additional pages if needed.
Name Maureen McCarran
Street Address 415 Albemarle Rd No. 5A
City and County Brooklyn, Kings
State and Zip Code NY 11218
Telephone Number 718-853-6617
E-mail Address m.mccarran@gmail.com

**B. The Defendants** Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.
Defendant No. 1 Official Capacity

Name Metropolitan Transit Authority Police Department
Job or Title Headquarters
Street Address 2 Broadway
City and County New York, New York
State and Zip Code NY 10004
Telephone Number 212-878-1001

Defendant No. 2 Official and Individual Capacity
Name Samuel Thomas Shield 2521
Job or Title Police Officer
Street Address Metropolitan Transit Authority Police Department, 2Broadway
City and County New York, New York
State and Zip Code NY 10004
Telephone Number 212-878-1001

Defendant No. 3  Official and Individual Capacity
Name PO Cortorreal Shield 2725
Job or Title Police Officer
Street Address  Metropolitan Transit Authority Police Department, 2Broadway
City and County New York, New York
State and Zip Code NY 10004
Telephone Number 212-878-1001

Defendant No. 4  Official and Individual Capacity
Name PO Yu Shield 3035
Job or Title Police Officer
Street Address  Metropolitan Transit Authority Police Department, 2Broadway
City and County New York, New York
State and Zip Code NY 10004
Telephone Number 212-878-1001

Defendant No. 5  Official and Individual Capacity
Name Yanique Johnson
Job or Title EMT Basic (DOC)
Street Address New York-Presbyterian Emergency Medical Service,
EMS Director, 525 East 68 St
City and County New York, New York
State and Zip Code NY 10065
Telephone Number 212-472-2222

Defendant No. 6  Official and Individual Capacity
Name Jeffrey Agnant
Job or Title EMT Basic (DS) (DH)
Street Address New York-Presbyterian Emergency Medical Service,
EMS Director, 525 East 68 St
City and County New York, New York
State and Zip Code NY 10065
Telephone Number 212-472-2222

**Note 2.** The clerk of court's instructions say not to include support documents or exhibits at this time. However, a list of exhibits is shown, at the end of the Relief Section, and referred to in this document in order to make later inquiries and references easier.

## II. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A. Are you bringing suit against (check all that apply):

☒ **State or local officials (a § 1983 claim)** ☐ Federal officials (a Bivens claim)

B. Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

## EXCESSIVE FORCE:

(1) On LIRR Track#1 THOMAS was sarcastic to start with, then angry when he asked if PLAINTIFF knew what day it was. He said, "Oh, even better, what year is it?" He did not wait for an answer.

(2) CORTORREAL snatched Plaintiff's cane from her, when she needed and tried to use it to comply with THOMAS' order to stand up.

(3) Plaintiff's was yanked by her wrists to her feet from sitting position on a bench, then thrown at the bench by THOMAS, ultimately landing on the floor.

(4) After PLAINTIFF was on the floor of the platform, THOMAS grabbed her wrists again and dragged her, face down, across the platform.

(5) CORTORREAL grabbed her pants, tearing a large hole in the seat of them.

(6) Upstairs, outside of the MTA and LIRR areas, YU covered her shield with her hand as she told the THOMAS that PLAINTIFF was taking pictures of them. THOMAS shouted at the plaintiff, "I've had enough of you!" Then THOMAS, CORTORREAL and YU charged at Plaintiff, grabbed her violently and violently rear-handcuffed her.

(7) Plaintiff told THOMAS, CORTORREAL and YU the handcuffs were too tight several times. They ignored her, physically took hold of her and forced her to walk to the other end of Atlantic Terminal and pushed her into the back of an ambulance. They still refused to loosen handcuffs after PLAINTIFF asked to loosen them in the ambulance.

(8) When they got to Methodist, in the parking garage, THOMAS grabbed her arm and nearly dragged her in to the emergency room, where she was seated.

(9) Every time anybody talked to her, THOMAS would heckle and mock her, and harassed her by physically hanging over her, in an unmistakable effort to intimidate her. Because of that, Dr Torrisi told him to leave.

(10) The Metropolitan Transit Authority Police Department (MTAPD) failed to train, supervise, discipline or otherwise control THOMAS, CORTORREAL and YU with regard to the proper use of force on arrestees.

**FALSE ARREST/FALSE IMPRISONMENT:**

(1) PLAINTIFF was never told she was under arrest but clearly, she was arrested. She was not free to go home and was forced by THOMAS, CORTORREAL and YU to go with them. PLAINTIFF was rear-handcuffed. When PLAINTIFF, THOMAS, CORTORREAL and YU got to the ambulance, THOMAS would not let anybody near PLAINTIFF, and physically blocked the Defendants EMT Yanique Johnson (JOHNSON) and EMT Jeffrey Agnant (AGNANT) from her. THOMAS would not allow JOHNSON and AGNANT to approach or examine PLAITIFF.

(2) However, Defendants JOHNSON and AGNANT were culpable for this charge as well. They did not examine PLAINTIFF at all, at any time. They did nothing to stop or protest the actions of THOMAS, CORTORREAL and/or YU. JOHNSON and AGNANT and allowed THOMAS, CORTORREAL and YU to ride in the back of the ambulance with the PLAINTIFF to the hospital. That is, they abetted them in forcing PLAINTIFF to go to NYP Methodist Hospital against her will.

They then colluded with THOMAS, CORTORREAL and YU to complete their false reports, at the hospital, after the PLAINTIFF left. PLAINTIFF knows this because she only gave her first name, no other information about herself, to YU on the platform of LIRR Track 1. No other information about the PLAINTIFF was given to JOHNSON, AGNANT, THOMAS, CORTORREAL and YU while PLAINTIFF was at the hospital because the time was too short for that to happen.

(4) PLAINTIFF had not done anything illegal and nothing to warrant any kind of arrest. She was not willing but did not resist the arrest. There was no real effort by any of the defendants to communicate at all. PLAINTIFF tried to comply when ordered to stand up. But CORTORREAL snatched away her cane, THOMAS hauled her to her feet, threw her down and dragged her. YU did ask her name but then said nothing more besides, "We're going upstairs now.", after glancing at THOMAS. PLAINTIFF would have just walked with THOMAS, CORTORREAL and YU, with the use of her cane, and answered any reasonable questions. Handcuffing her at all was outrageous because all she had done was take cellphone photographs of THOMAS, CORTORREAL, YU and a civilian with whom CORTORREAL was conversing. Rear-cuffing the PLAINTIFF was even more excessive and, because Defendants refused repeated requests to loosen the handcuffs, directly causing more physical and psychological damage to the Plaintiff.

5

(5) The Metropolitan Transit Authority Police Department (MTAPD) failed to train, supervise, discipline or otherwise control THOMAS, CORTORREAL and YU with regard to the false arrest/false imprisonment of arrestees.

~~C. Plaintiffs suing under Bivens may only recover for the violation of certain constitutional rights. If you are suing under Bivens, what constitutional right(s) do you claim is/are being violated by federal officials?~~

D. Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under Bivens, explain how each defendant acted under color of federal law. Attach additional pages if needed.

Officers of the MTAPD are authorized by the State of New York to perform all police duties. THOMAS, CORTORREAL and YU, under color of law, violated the federal 4th Amendment rights of the PLAINTIFF while they purported or pretended to act in the performance of their official duties. Under color of law, all three of them used excessive force and falsely arrested the PLAINTIFF, as discussed above. Furthermore, the idea of qualified immunity is that a person acting under color of law is not personally liable for violating someone's civil rights unless that person knew or should have known they were violating clearly established law. As law enforcement officers, they had to or should have known that what they were doing and how they were engaging with the PLAINTIFF was a violation of law and her civil rights. It is reflected in the false accounts told to Dr Torrisi at the hospital and which THOMAS filed. The incident report does not match the Ambulance Report **EXHIBIT D** either.

JOHNSON and AGNANT are Emergency Medical Technicians employed by New York-Presbyterian Emergency Medical Services (NYP-EMS). On their website it states "We work with the Fire Department of New York, the New York City Office of Emergency Management, the New York City Department of Health and Mental Hygiene, and the New York State Department of Health to conduct emergency planning and preparedness activities. New York-Presbyterian Emergency Medical Services also cooperates and collaborates with the Greater New York Hospital Association on issues involving hospital-based emergency medical services." That is, they are contracted with New York State to provide emergency medical and general ambulance services to the municipality's residents, as authorized by state law. As such, they fall under the purview of Section 1983, because they contract with government entities to provide services and the services they offer constitute public functions.

A circumstance that may give rise to Section 1983 liability for a private medical provider, known as *joint action* or *joint participation theory*, applies when a private actor works alongside and in conjunction with government actors. Under the joint action theory, a private party can be said to have acted "under color of state law" for the purposes of Section 1983 when the private party is a "willful participant in joint activity with the State or its agents." This fits the role JOHNSON and AGNANT

assumed, when they thoroughly and unquestioningly accommodated demands made by THOMAS, to transport PLAINTIFF to the hospital, against her will, when there was no other reason to do so. In their own report, they stated the PLAINTIFF was calm and alert. JOHNSON made a weak observation that PLAINTIFF was intoxicated because she could smell alcohol on PLAINTIFF's breath. But it is not logical (and not true at all) because she could not smell that when both she and PLAINTIFF were wearing masks. No other defendant or the hospital doctor made that observation. Johnson was never any closer than about 6 feet away from the PLAINTIFF at any time, including inside the ambulance. Even if true, it was not an indication that PLAINTIFF needed a hospital. JOHNSON also does not mention that there were any officers in the ambulance or that PLAINTIFF was handcuffed. JOHNSON fabricated the entire story, to corroborate THOMAS' account. She did sort of match his times. But her report was a contradictory attempt to help him lie his way through. It was part of a joint attempt to excuse all of the DEFENDANTS' behavior, at the expense of the PLAINTIFF.

**III. Statement of Claim**
State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. Where did the events giving rise to your claim(s) occur?
On Track 1 of the Long Island Railroad (LIRR), inside the MTA Barclay Center subway station, that subway station itself, inside and outside of Barclay Center, Brooklyn, NY and at New York Presbyterian (Methodist) Hospital Emergency Room, Brooklyn, NY

B. What date and approximate time did the events giving rise to your claim(s) occur?
10/20/21 between 9:30 and 11:15 at night

C. What are the facts underlying your claim(s)? (For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)
On October 20, 2021, at approximately 9:40 at night, PLAINTIFF arrived via the R train in the Barclay Center/Atlantic Ave subway station in Brooklyn NY. PLAINTIFF intended to transfer to the Q train at that station. As PLAINTIFF walked towards the Q platform, she saw a man ahead of her, to the left. He was leaning against the wall, until he saw her. He called out to her. PLAINTIFF is elderly. She uses a cane to walk for intermittent balance issues and sudden, painful spasms in her legs and feet. PLAINTIFF was aware that she appeared to be and was vulnerable and that there were few people in the station at that time. She became fearful of this man and therefore she did not answer him or make eye contact with him. He started walking towards PLAINTIFF and addressed PLAINTIFF again. She felt she had to get away from him and was afraid he was getting ready to attack her. She shouted at him to get away from her. PLAINTIFF moved as quickly as she could to a platform that was off the large corridor they were in. He yelled at her "Don't go in there! Don't go in there!" That made PLAINTIFF

7

think maybe there were people, maybe even police in there, or maybe another way out. So it would be the very place for her to go. But there were no others, no signs of what platform PLAINTIFF was on, no other way out. PLAINTIFF turned back and sat down on a bench to catch her breath and think of what to do next. At least the man in the corridor did not seem to have followed her in there. She learned much later that she had fled into the unmarked Track 1 of the LIRR.

Shortly thereafter, at about 10:00 PLAINTIFF saw 2 male police officers walking towards her. PLAINTIFF thought that these were New York City Police officers but later learned they were from the MTAPD. PLAINTIFF was relieved and believed they would help her safely get to where she was going. Instead, before PLAINTIFF could say anything, THOMAS was aggressive and hostile to her, demanded to know what day it was, then "No, even better, what year is it?" PLAINTIFF was dumbfounded at the level of hostility. All PLAINTIFF was doing was sitting on a bench. PLAINTIFF answered "2021". THOMAS lunged towards her and yelled at her to get up. PLAINTIFF reached for her cane so she could do that. CORTORREAL said "Oh no you don't!" and grabbed it out of her hand. THOMAS hauled PLAINTIFF up by her wrists, until she was nearly standing. Then he let go, with a shove. PLAINTIFF fell back and down, hitting the bench on her left side and winding up on her back on the floor. Then THOMAS came at her again, grabbed her wrists again and began to drag her. Her face was now facing the floor. PLAINTIFF believed they were going to kill her and started screaming. CORTORREAL grabbed her by the seat of her pants and attempted to lift her that way. That tore a hole in the seat and nearly tore them off of her. PLAINTIFF was finally able to stop screaming and yell to give her the cane back. THOMAS and CORTORREAL gave her the cane and PLAINTIFF got up and stared at them. THOMAS said they needed to "get a woman". The female Defendant, Officer YU came to the platform. She asked PLAINTIFF her name. PLAINTIFF told her only "Maureen". PLAINTIFF was too afraid to say anything more. That was all any of the defendants ever asked the Plaintiff. None of the Defendants ever indicated why they were doing this. THOMAS, CORTORREAL and YU marched PLAINTIFF up some stairs and outside of the LIRR and MTA stations. They made her stand against a wall at the Hanson Place entrance, down the hall from their own office, while CORTORREAL talked to a man who seemed to be a civilian. They joked around together. That man might have been who accosted Plaintiff. PLAINTIFF was and is not sure. He was the same height, build and wearing similar clothing. But he would not let her see his face. Even if he was a NYPD plainclothes officer, he did not identify himself as one, had no business with her and the PLAINTIFF may defend herself if she feels as endangered as she did. PLAINTIFF then took out her cellphone and started taking photos of all four of them. The date/time of those images on her cellphone and Adobe Bridge has a creation date of October 20, 2021 at 10:12. (EXHIBIT A) THOMAS was on his cellphone. He said to YU, "They won't come down." and shook his head. Plaintiff believes, in hindsight, that THOMAS was referring to JOHNSON and AGNANT. Then YU told THOMAS "She's taking pictures of us." while covering her shield with her hand. It infuriated THOMAS. He shouted at the PLAINTIFF that he had had enough of her. Then THOMAS, CORTORREAL and YU charged at her. All 3 uniformed MTA employees laid hands on her, snatched her cane away again and handcuffed

her violently, behind her back. PLAINTIFF cried out they were too tight; they hurt and she couldn't feel her hands. They ignored her. They walked her upstairs and marched her through the shopping mall, where everybody could see her. While they waited, inside the mall, for the EMTs to get there, PLAINTIFF tried to attract attention, hoping that somebody would document the arrest. She said, loudly, "I just want to go home." a few times. THOMAS, CORTORREAL and YU did not injure or menace her while there were potential civilian witnesses. When the ambulance finally got there, they went outside. PLAINTIFF never saw the EMTs up close at all and THOMAS would not even let her see who the ambulance company was. He told her that she didn't "need to know that." Defendant EMTs JOHNSON and AGNANT were standing outside the ambulance, several feet away from it. Neither of them was ever anywhere near the Plaintiff. THOMAS, CORTORREAL and YU surrounded PLAINTIFF until they opened the ambulance door. THOMAS, CORTORREAL and YU made the PLAINTIFF enter the ambulance and all of them got in with her. THOMAS, CORTORREAL sat behind Plaintiff. YU sat in front of Plaintiff. JOHNSON said she could not get any vitals under those conditions. THOMAS said something to her that PLAINTIFF could not hear. Johnson got into the front seating area with AGNANT and they slowly drove away, with no siren or lights flashing.

They took the PLAINTIFF to New York Presbyterian Methodist Hospital (Methodist), against her will. In the ambulance, YU acted like she was trying to "comfort" PLAINTIFF but would not loosen the handcuffs because THOMAS said not to. PLAINTIFF cried all the way to the ER. They got to the emergency entrance through an area that looked like a parking garage. THOMAS, CORTORREAL, YU and PLAINTIFF exited the ambulance. THOMAS said "We take the cuffs off out here." They took the cuffs off outside the ambulance, in the parking garage. Then THOMAS grabbed Plaintiff's arm and continued to be menacing and threatening. He was nearly dragging her to the ER. CORTORREAL, YU, JOHNSON AND AGNANT stayed behind. PLAINTIFF was still unable to use her cane but was at least holding it. She stumbled along with THOMAS as he nearly dragged her to the emergency room, through the doors and into a chair. She was disheveled from being assaulted, her eyes puffy and red from crying, her feet were bleeding from being dragged. THOMAS heckled and mocked her, standing over her in a menacing way. She was terrified and therefore identified herself to the resident doctor, Dr Torrisi (TORRISI), by giving only her birthdate because she was in the system there. She was taken to a nurse, who produced a wristband, based on the birthdate PLAINTIFF stated and asked her if that was her. PLAINTIFF said it was and vitals were taken by that nurse. When PLAINTIFF was returned to TORRISI, he tried to get PLAINTIFF to admit she was intoxicated. PLAINTIFF was not intoxicated and refused to say she was. It was now clear to her that TORRISI was just trying to find a way to get her out of there, not caring about any accuracy. She was too frightened to tell him anything. THOMAS continued his menacing, belligerent behavior to PLAINTIFF. TORRISI finally told THOMAS "That's enough!". THOMAS aggressively asked him if he wanted him to leave. TORRISI said "Yes. Leave". Another male doctor came and sat down. He didn't ask her anything but stared at her red, puffy eyes and disheveled clothing. She never saw the female attending pysician who signed the report. Shortly after that, she was discharged. She had been at the hospital for 12 minutes.

PLAINTIFF was never told she was under arrest or given any reason for their behavior to her.

Because PLAINTIFF never told anyone her last name, the reports had to all be done after PLAINTIFF left the hospital. Despite Dr TORRISI, and THOMAS, CORTORREAL, YU, JOHNSON and AGNANT all being present, all the reports have conflicting information. None are correct. Dr TORRISI reported a false story of how PLAINTIFF got there. Nobody at the hospital had ever asked PLAINTIFF what her story was (she was terrified of THOMAS and would not speak when he was there). THOMAS and/or CORTORREAL and/or YU had to have given him the false story.

PLAINTIFF has reports from hospital, MTAPD incident and NYP Ambulance. She has a written a detailed discussion of how these reports conflict with each other, even though they were supposed to corroborate each other.

JOHNSON and AGNANT were accomplices to the actions of THOMAS, CORTORREAL, YU. They did not find anything wrong with the PLAINTIFF that would have led them to transport the PLAINTIFF to the hospital. They did not state any aggressive or criminal behavior. But they allowed the too-tight handcuffs to stand, they allowed 3 officers in the ambulance, with, and nearly on top of the Plaintiff, making it impossible for them to examine PLAINTIFF or take vitals. They made a false report and let THOMAS, CORTORREAL, YU use them for non-emergency transport. JOHNSON and AGNANT did nothing to stop anything THOMAS, CORTORREAL, YU did or proposed. They did help them do whatever they felt like doing.

**IV. Injuries**
If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.
Besides the events described above, PLAINTIFF was released 12 minutes after she was in the emergency room, had to wait for a bus, alone in the dark, with the seat of her pants torn away, still disheveled, red-eyed and felt humiliated. The bus driver thought she had been attacked, as she had been. The other passengers stared at her contemptuously. PLAINTIFF had always regarded police and ambulance personnel as public servants who were helpful to people. Instead, they attacked her, humiliated her and caused lasting injury and damage. PLAINTIFF had done nothing wrong. She did not resist arrest. The doctor at the hospital was no help at all and, in the end, even went along with her attackers for his own convenience. All of these factors thoroughly traumatized the Plaintiff. Being assaulted and terrorized for an hour or so might not sound that significant to some. But the pain and suffering the PLAINTIFF experienced continues to this day. She could not leave the house or talk to anybody for days and was visibly shaking for several more days afterwards. She was fearful, experiencing dizziness, confusion, headaches, intense backaches and pain in her left hip **EXHIBIT K**, painful hands and wrists and no feeling at all in her right thumb for months **EXHIBIT G**. She could not stop shaking and crying. She had partial amnesia about the traumatic incident for several months.

10

She was and is still experiencing headaches, blurred vision, insomnia, nightmares, anxiety, Post Traumatic Stress Disorder, stomach pains and other symptoms.

PLAINTIFF had welts on her wrists from handcuffs that were too tight. PLAINTIFF had no feeling in much of her right thumb. It caused her to finally leave her home, to seek medical attention. PLAINTIFF was diagnosed with radial nerve damage in her right wrist by Dr Mariam Zakhary at Mount Sinai-Union Square. She had limited use of her right hand for a few months. Plaintiff's left hip was also injured when she was thrown against the bench, diagnosed by Dr Zakhary as sacroiliac joint pain. PLAINTIFF sought relief by physical therapy at Mount Sinai, as recommended by Dr Zakhary. When that was not effective, she sought relief by chiropractic sessions with Dr. Gerard Rosato, DC. The recovery was not complete and PLAINTIFF still needs adjustments and or injections for the pain.

While at Dr Zakhary's office, PLAINTIFF broke down, crying uncontrollably. Dr Zakhary summoned a licensed clinical social worker (LCSW). The LCSW interviewed the PLAINTIFF and assisted her in finding resources that would help her. PLAINTIFF subsequently sought and had psychotherapy treatment from a licensed mental health counselor (LMHC) at Crime Victims Treatment Center, who diagnosed her with Post Traumatic Stress Disorder. They gave 10 sessions over 3 months with a LMHC. Crime Victims Treatment Center is a charity and can only provide that many sessions EXHIBIT H. It was helpful but not nearly sufficient. PLAINTIFF had to search several months before she found Dr. Alina Clavijo-Passik, PHD, a psychologist at Teladoc. Teladoc is a provider her insurance covers. Dr Clavijo-Passik was abruptly terminated by Teladoc in September 2023, before Plaintiff's treatment was done. Teladoc has not been effective or at all helpful getting a new therapist. PLAINTIFF needs a psychologist, not a LMHC, for the effects of the events on the night of 10/20/2021. The interruptions in her treatment have extended the time needed for treatment. She would not need the treatment at all, if not for the listed Defendants. Because of a national shortage of qualified mental health workers, PLAINTIFF has searched but has not been able to find any psychologist who takes her insurance or works with Teladoc, who accepts new patients. She needs to go out of her insurance's network and cannot afford to do so.

PLAINTIFF was wearing open toed shoes the night she was attacked. Her toes were scraped raw and she could not wear closed-toed shoes for over 3 weeks, in November. Because her feet hurt so much, she was concerned something might be broken or that a foot surgery might have been damaged. She went to Dr. Joseph Alencherry of Foot and Ankle Surgeons of New York, who had performed the foot surgery. There was no breakage but the painful scrapes and contusions were noted. EXHIBIT I.

Her pants were damaged beyond repair.

It is still painful for her to walk because of the damage to her back and hip. Initially, she thought it was a badly bruised hip and back strain. That has turned out to not be the case. EXHIBIT J It is not known how long that physical therapy will take, nor is there a concrete amount of time she will need additional psychotherapy. PLAINTIFF sought treatment as soon as she was able to. Because of

11

providers' availability, insurance issues, having COVID-19 twice which became long COVID, there have been gaps in the actual treatments. PLAINTIFF must now go out of her insurance network to find competent and timely help and she cannot afford those bills.

She had to forgo a job that would have paid her around $5000 because she could not focus or concentrate on her work. EXHIBIT L

**V. Relief**
State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims. **Monetary award of $63,913**
$29,842 is the total of medical expenses past [paid] and future [not paid]) x 1.5 damage factor = $44,763 (Pain, suffering, punitive damages) + $5,150 (lost wages and damaged property) = $49,913 + $14,000 = $63,913

**Expense Reference Table**

| | |
|---|---|
| Women's black cotton pants: seat ripped out by police (current replacement) | $125 |
| Cotton canvas tote bag torn by police (current replacement) | $25 |
| Ambulance | $1000 |
| Emergency Room | $1500 |
| Past medical visits for: Bruises, scratches, contusions, pulled and strained muscles in neck, back, arms ,legs, wrists hands, ankles and feet. Violent headaches, flashes and blurred vision. Radial nerve damage to right wrist. Chronic pain in back and left hip, leg spasms. Chest and stomach pain. Future medical costs are unknown at this time. | $14342 |
| Psychological: Insomnia, nightmares, anxiety, Post Traumatic Stress Disorder. Future therapy sessions will be, on average, about $300, twice weekly for about 8 months (likely future medical) | $14,000 |
| Lost wages | $5000 |

**LIST OF EXHIBITS**

| | |
|---|---|
| A | Images From 10/20/2021 Including Before Incident And During Incident |
| B | Images From 10/20 And 10/21/2021 Showing Some of Plaintiff's Injuries And Damages |
| C | Defendant's Incident Report |
| D | Ambulance Report |
| E | Ambulance Routes And Timing |
| F | Methodist Hospital Report |
| G | Mariam Zakhary, DO Notes From 10/28/21 and 09/29/22 |
| H | Mohammadee Bhaiyat LMHC Diagnostic Letter |
| I | Joseph Alencherry, DPM Notes |
| J | Rachel Louissaint, PT, DPT Notes |
| K | Email Regarding Work Pieces Cancelled Due To Plaintiff's Inability to Fully Concentrate on Them |

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. 7

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: October 11, 2024.

Signature of PLAINTIFF _____

Printed Name of PLAINTIFF Maureen McCarran